UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**OMAR ALOMARI,**

    **Plaintiff,**

    v.

**Civil Action 2:11-cv-00613**
**Judge Algenon L. Marbley**
**Magistrate Judge Elizabeth P. Deavers**

**OHIO DEPARTMENT OF**
**PUBLIC SAFETY,** *et al.*,

    **Defendants.**

## DISCOVERY OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff's Motion to Compel Discovery. (ECF No. 33.) Defendants filed their Response in Opposition to Plaintiff's Motion on August 2, 2013. (ECF No. 34.) Pursuant to this Court's July 26, 2013 Order, Plaintiff was prohibited from filing a Reply brief. For the reasons that follow, with respect to one of the three issues Plaintiff raises, Plaintiff's Motion is **DENIED**. The Court defers ruling on the two remaining issues until the parties submit additional materials, as set forth herein.

**I.**

Plaintiff is a former employee of the Ohio Homeland Security ("OHS"), a division of the Ohio Department of Public Safety ("ODPS"). He alleges that ODPS terminated him in June 2010 because of his race, national origin, ethnicity, and religion, and in retaliation for opposing anti-Muslim and anti-Arab counterterrorism training. (Compl. ¶ 1, ECF No. 2.)

Plaintiff, an Arab and Muslim, immigrated to this country in 1978. In 2005, Defendants hired him to serve as a liaison between OHS and the Muslim communities and to build relationships between OHS, law enforcement and the local Arab and Muslim population.

According to the Complaint, Plaintiff also researched and authored publications on Arab and Muslim communities and presented educational information to law enforcement on behalf of OHS concerning cultural issues.

Plaintiff alleges that in November 2008, OHS held a training session for its terrorism-liaison officers. *Id.* at ¶ 18.  Concerned about the way in which the training characterized Arabs and Muslims, Plaintiff informed the Director of OHS that the purported anti-Muslim and anti-Arab contents of the training session undermined OHS' efforts to build and maintain relationships with the Arab and Muslim communities.  Plaintiff contends that OHS held similar anti-Muslim and anti-Arab training session throughout 2009.  He alleges that he continued to voice concern to the Director of OHS regarding the purported mischaracterization of all Central Ohio Muslims and Arabs as terrorists or terrorism-sympathizers.  *Id.* at ¶ 22.  Plaintiff represents that his photograph was shown during one of the training session as an example of a terrorism-sympathizer.  In addition to expressing concern to the Director of OHS, Plaintiff alleges that he contacted the Office of Civil Rights and Civil Liberties and the United States Department of Homeland Security to report the inaccuracies the training sessions portrayed.  According to Plaintiff, Defendants ultimately terminated him on pretext but that the true reason was retaliation for his complaints, and because of unfounded media and other inquiries suggesting that Plaintiff might be a terrorism-sympathizer.

Defendants assert that ODPS terminated Plaintiff because he intentionally withheld from his employment application a position he held at Columbus State Community College ("Columbus State").  Plaintiff's employment at Columbus State allegedly ended following an inappropriate relationship he shared with a female student.  The parties indicate that in 2010

various media outlets began to inquire of OHS and ODPS concerning Plaintiff's departure from Columbus State and his failure to list the position on his employment application.  In April 2010, ODPS prompted an administrative investigation into the circumstances surrounding Plaintiff's departure from Columbus State and his failure to disclose the position on his employment application.  The investigator, Kathleen Bourke-Botos, ultimately concluded that Plaintiff failed to provide accurate information on his employment application.  Defendants contend that they relied on the results of the investigation in deciding to terminate Plaintiff.

In the instant Motion, Plaintiff seeks an Order compelling testimony related to two meetings leading up to his termination that were held with ODPS' in-house counsel.  He also seeks to depose ODPS' in-house counsel concerning their role in providing materials to the administrative investigator.  He asserts that this information will prove that Defendants' stated reason for terminating him is a pretext for discrimination and retaliation.  Defendants oppose Plaintiff's requests, primarily on the grounds of attorney-client privilege.

## II.

**A.    Standard for Attorney-Client Privilege**

The attorney-client privilege is recognized as the oldest privilege relating to confidential communications.  *Upjohn v. United States*, 449 U.S. 383, 389 (1981).  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  *Id.*  In *Upjohn*, the United States Supreme Court explored the contours of the attorney-client privilege as it relates to corporate employees.  449 U.S. at 386-97.  In rejecting the "control group test," the Supreme Court emphasized that "the privilege exists to protect not only the giving of legal

advice to those who can act on it but also the giving of information to the lawyer to enable him [or her] to give sound and informed advice." *Id.* at 390. As the Supreme Court recognized, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 390-91. In light of *Upjohn*, "it is now well settled that private corporations and other organizations may constitute clients for purposes of the attorney-client privilege." *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998).

The Sixth Circuit Court of Appeals articulated the following test to determine whether a communication is privileged: "(1) where legal advice of any kind is sought (2) from a professional legal adviser in his [or her] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [or her] insistence permanently protected (7) from disclosure by himself [or herself] or by the legal advisor, (8) unless the protection is waived." *Reed*, 134 F.3d at 355-56 (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)).

In addition, "the mere fact that in-house counsel is present at a meeting does not shield otherwise unprivileged communications from disclosure." *Neuder v. Battelle Pac. Nw Nat'l Lab.*, 194 F.R.D. 289, 293 (D.D.C. 2000). Rather, the attorney-client privilege "applies only to communications made to an attorney in his capacity as legal advisor." *Id.* at 292. "Where business and legal advice are intertwined, the legal advice must predominate for the communication to be protected." *Id.* at 292. In determining whether communications made in counsel's presence are privileged, courts have considered whether counsel serves dual roles for the corporation. *Naik v. Boehringer-Ingelheim Pharm., Inc.*, No. 07-c-3500, 2008 WL 4866015, *2 (N.D. Ill June 19, 2008) (concluding that communications were not privileged, partly because

4

"there is no suggestion that BIPI's in-house counsel was serving on a committee charged with considering employment issues").

Furthermore, "[t]he burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 188 F.3d 663, 667 (6th Cir. 1999). Simply asserting that information is privileged "is insufficient to meet the burden." *In re Trans-Indus.*, No. 1-10 MC 24, 2011 WL 1130410, *4 (N.D. Ohio Mar. 28, 2011). Rule 26 of the Federal Rules of Civil Procedure requires a party who seeks to withhold otherwise discoverable information on the basis of privilege to assert a claim of privilege and "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable to the other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); *see also Cooey v. Strickland*, 269 F.R.D. 643, 649 (S.D. Ohio 2010) (citing *In re Search Warrant Executed at Law Offices of Stephen Garea*, No. 97-4112, 1999 WL 137499 (6th Cir. Mar. 5, 1999) ("The privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice."). Here, Plaintiff seeks an Order compelling testimony concerning discussions that occurred at two meetings where ODPS' counsel was present.

**B.     April 2010 Meeting**

Plaintiff first seeks to compel testimony concerning communications from an April 2010 meeting at which he was present along with his supervisor and ODPS' counsel. (Mot. 4, ECF No. 33.) The purpose of the meeting, according to Plaintiff, was to determine how to respond to media inquiries related to his departure from Columbus State and his failure to include Columbus State on his employment application. Plaintiff posits that the attorney-client privilege

does not protect discussions that occurred during the meeting because its purpose was to discuss media inquiries, not solicit or render legal advice. Even if the purpose was to solicit or render legal advice, Plaintiff asserts that the privilege nevertheless fails to attach because he did not know that the meeting was called for such purpose, as *Upjohn* requires.

      The Court disagrees. First, as Defendants point out, the record demonstrates that the purpose of the April 2010 meeting was for counsel to ask Plaintiff questions so that she could advise ODPS how to respond to the media inquiries. Plaintiff testified that counsel and his supervisor "really wanted to ask questions and prepare a response to the [media inquiries]." (Alomari Dep. 167:3-5, Mot. Ex. 1, ECF No. 33-1.) Plaintiff's supervisor testified that it was apparent from the media inquires that "this was enough of an issue that we need to – or he needs to consult with legal and go from there." (Vedra Dep. 50:2-4, Op. Ex. 2, ECF No. 34-2.) Second, Plaintiff's testimony indicates that he was sufficiently aware that the purpose of the meeting was to provide information to counsel for this purpose. He testified that counsel explained the media inquiries to him, and stated that she wanted to understand the underlying circumstances to determine how to respond. (Alomari Dep. 166:18-167:5, Mot. Ex. 1, ECF No. 33-1.) Accordingly, Plaintiff's request to compel testimony related to the April 2010 meeting is **DENIED**.

**C.**    **June 2010 Meeting**

      Plaintiff next seeks an Order compelling testimony as to discussions from a June 2010 meeting that the then-director of ODPS called apparently to determine how to proceed in light of the results of the administrative investigation of Plaintiff. In addition to the director, the Assistant Director of ODPS, a member of human resources, a member of administration,

Plaintiff's supervisor, the deputy chief of staff of public safety, and ODPS legal counsel attended the meeting. (Vedra Dep. 53:15-23, Op. Ex. 2, ECF No. 34-2.) Plaintiff's supervisor testified that during the meeting they reached a "consensus or [] decision" to terminate Plaintiff. *Id.* at 57:19-23. Plaintiff seeks to discover how those in attendance reached the decision to terminate him, and maintains that the mere presence of counsel is insufficient to trigger the attorney-client privilege.

The record contains insufficient information for the Court to determine whether the attorney-client privilege protects discussions that occurred at the June 2010 meeting. As discussed above, "the mere fact that in-house counsel is present at a meeting does not shield otherwise unprivileged communications from disclosure." *Neuder*, 194 F.R.D. at 293; *see also Curtis v. Alcoa, Inc.*, No. 3:06-cv-448, 2009 WL 838232, *2 (E.D. Tenn. March 27, 2009) (holding communications at meetings attended by attorneys not automatically privileged). Rather, the attorney-client privilege "applies only to communications made to an attorney in his capacity as legal advisor." *Id.* at 292. "Where business and legal advice are intertwined, the legal advice must predominate for the communication to be protected." *Id.* at 292. In determining whether communications made in counsel's presence are privileged, courts have considered whether counsel serves dual roles for the corporation. *Naik*, 2008 WL 4866015 at *2 (concluding that communications were not privileged, partly because "there is no suggestion that BIPI's in-house counsel was serving on a committee charged with considering employment issues").

Here, although Plaintiff asserts that the purpose of the meeting was to discuss the results of the investigation, neither party has supplied evidence of the actual substance of the June 2010

communications.  The Court is thus unable to determine whether the relevant discussions were made to counsel in her capacity as legal advisor, or whether legal advice predominated among legal discussions intertwined with business communications.  Recognizing that Defendants carry the burden of demonstrating privilege, and in the interest of justice, Defendants are **DIRECTED** to submit for *in camera* inspection an affidavit setting forth the substance of the June 2010 communications, focusing on the communications and the role of in-house counsel, **WITHIN SEVEN (7) DAYS OF THE DATE OF THIS ORDER**.  The Court will then determine whether the privilege applies to the communications.

## III.

Finally, Plaintiff seeks to depose three lawyers who served as in-house counsel for ODPS at the time of the administrative investigation.[1]  According to Plaintiff, the three lawyers in question acquired documents from Columbus State to provide to the administrative investigator, Bourke-Botos.  Columbus State purportedly provided a hand-written settlement agreement to counsel reflecting that Plaintiff was permitted to resign from his position.  Bourke-Botos,

---

[1] The Court notes that Plaintiff did not present this as an issue during the judicial conference that led the Court to impose the briefing schedule on the issues discussed above. *See* July 22, 2013 Order and July 26, 2013 Order, ECF Nos. 30 and 32 (expediting briefing on the attorney-client privilege issues set forth above).  Nor did Plaintiff otherwise indicate to or request permission from the Court to include this issue for consideration with the issues addressed in the prior Orders.  Moreover, Plaintiff apparently failed to comport with his duty under Local Rule 37.1 to consult with opposing counsel prior to filing motions on a discovery dispute.  S.D. Ohio Civ. R. 37.1; *see generally* Mot., ECF No. 33 (containing no indication that Plaintiff complied with his obligation under Rule 37.1); Op. 9, ECF No. 34 (indicating that Plaintiff failed to consult with defense counsel on this issue).  Nevertheless, in the interest of justice and in an effort to avoid penalizing Plaintiff for what appears to be his counsel's missteps, the Court will consider Plaintiff's request to compel the depositions of ODPS' counsel.  Counsel are still encouraged to negotiate on the issue and to determine whether Plaintiff may obtain the information he seeks short of deposing counsel.

however, never received that agreement. Relying on other documents that counsel provided, Bourke-Botos ultimately concluded that Plaintiff lied when he stated that he resigned from Columbus State. In the instant Motion, Plaintiff seeks to depose ODPS counsel to determine why they failed to provide the purportedly exculpatory settlement agreement to Bourke-Botos.

Plaintiff identifies the "*Faragher-Ellerth*" affirmative defense in supports of his position. (Mot. 16, ECF No. 33.) The *Faragher-Ellerth* defense permits an employer defending a hostile work environment claim to assert that it exercised reasonable care to prevent and correct discriminatory behavior. *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In doing so, the employer waives any privilege that would otherwise protect documents related to the adequacy of the investigation, including documents reflecting its efforts to prevent and correct the discrimination. *McKenna v. Nestle Purina PetCare Co.*, No. 2:05-cv-976, 2007 WL 433291, at *4 (S.D. Ohio Feb. 5, 2007). In the absence of any allegation of a failure to investigate, the *Faragher-Ellerth* defense neither applies nor is helpful in this case.

The appropriate inquiry, which neither party identified in their briefing, is whether the three-prong test applies that the Eighth Circuit crafted in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986). The analysis begins with recognition that the Federal Rules of Civil Procedure generously permit discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). Consistent with the Rules' liberal stance on discovery, Fed. R. Civ. P. 30(a)(1) provides that: "[a] party may, by oral questions, depose *any person*, including a party, without leave of court . . . ." (emphasis added). The Sixth Circuit has adopted the three-part test articulated in *Shelton*, limiting this presumption of

9

openness in discovery in instances when the deponent is opposing trial/litigation counsel:

> Discovery from an opposing counsel is "limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case."

*Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton*, 805 F.2d at 1327 (citation omitted)).

In *Shelton*, parents of a child who died as a result of a rollover accident brought suit against an automobile manufacturer. 805 F.2d at 1324. Plaintiff sought to depose opposing trial counsel about her discovery preparation for that case, namely, about the existence of certain documents possessed by counsel's client. *Id*. at 1326. Plaintiff's counsel admitted that his sole purpose in deposing opposing counsel was to determine whether opposing counsel had truthfully complied with his written discovery. *Id*. at 1327-28. It was against this backdrop that the *Shelton* court crafted the three-part test to be satisfied prior to a deposition of opposing trial counsel. Notably, prior to setting forth the three-part test, the *Shelton* court declared: "We do not hold that trial counsel is absolutely immune from being deposed. We recognize that circumstances may arise in which the court should order the taking of opposing counsel's deposition." *Id*. at 1327. Further, in concluding that opposing counsel could not be deposed under the circumstances presented in that action, the *Shelton* court specifically noted that: "[i]n-house counsel in this case had nothing to do with this lawsuit except to represent her client." 805 F.2d at 1330.

The Eighth Circuit revisited this issue in *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726 (8th Cir. 2002). *Pamida* involved a suit against a manufacturer seeking indemnification for attorney's fees and costs incurred in defending an underlying, completed patent infringement

suit. 281 F.3d at 728. The *Pamida* Court identified the principle rationales driving *Shelton*:

> *The* Shelton *test was intend* [sic] *to protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney's litigation strategy.* Because this abuse of the discovery process had become an ever increasing practice, this Court erected the *Shelton* test as a barrier to protect trial attorneys from these depositions. But *Shelton* was not intended to provide heightened protection to attorneys who represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial. In such circumstances, *the protection* Shelton *provides to opposing counsel only applies because opposing counsel is counsel in the instant case and not because opposing counsel had represented the client in the concluded case*.

*Id.* at 730-31 (citations omitted) (emphasis added). Thus, *Padima* suggests that *Shelton* only applies when: (1) the deponent is either trial/litigation counsel in the instant case; and (2) the information sought would expose litigation strategy in the pending case. *See id*.

Like the *Padima* court, other courts presented with similar requests to extend *Shelton* have decline to do so. *See, e.g., Williams v. Wellston City Sch. Dist.*, No. 2:09-cv-566, 2010 WL 4513818, \* (S.D. Ohio Nov. 2, 2010) (declining to extend *Shelton* to situations in which the proposed deponent is in-house counsel who had not served as counsel in the subject litigation); *Spine Solutions, Inc. v. Medtronic Sofamor Danek, Inc*., 2008 WL 199709, \*3 (W.D. Tenn. January 23, 2008) (finding *Shelton* inapplicable where proposed deponent was the prosecuting attorney of the patent-in-suit, but was not litigation counsel in the instant action and where there was no contention that allowing his deposition to be taken would divulge any litigation strategy); *El Bannan v. Yonts*, 2007 WL 1428653, \*6 (W.D. Ky. May 11, 2007) (declining to apply the *Shelton* test where it was unclear whether the proposed attorney deponent was a member of the Defendant's legal team and where the court determined that the proposed deponent "may have knowledge of certain facts outside the scope of legal representation related to the case"); and

11

*United States v. Philip Morris, Inc.*, 209 F.R.D. 13, 15 and 19 (D.D.C. 2002) (declining to extend *Shelton* where the proposed deponents were the opposing party's in-house counsel, but were not trial counsel in the instant action and where the information sought was non-privileged and relating to "'public relations,' 'corporate conduct and positions,' marketing strategies, tobacco research and development, and the Master Settlement Agreement").

In light of the foregoing, the parties are **DIRECTED** to brief (1) whether *Shelton* applies; and (2) if so, what the outcome is here under the *Shelton* analysis **WITHIN SEVEN (7) DAYS OF THE DATE OF THIS ORDER**. In light of the upcoming discovery cutoff deadline, there will be no memoranda in opposition or reply briefs.

## IV.

Accordingly, Plaintiff's request to compel testimony related to the April 2010 conference with counsel is **DENIED**. (EF No. 33.) With respect to the remaining two issues, Defendants are **DIRECTED** to submit for *in camera* inspection an affidavit setting forth in detail the substance of the communications of the June 2010 meeting, focusing on the communications and the role of in-house counsel, and the parties are **DIRECTED** to brief the issues of whether (1) *Shelton* applies to Plaintiff's request to depose ODPS' counsel and (2) if so, what the outcome is under the *Shelton* analysis, **WITHIN SEVEN (7) DAYS OF THE DATE OF THIS ORDER**. In light of the upcoming discovery deadline, no memoranda in opposition or reply briefs will be permitted.

**IT IS SO ORDERED**.

Date: August 21, 2013                                          /s/ *Elizabeth A. Preston Deavers*
                                                                        Elizabeth A. Preston Deavers
                                                                        United States Magistrate Judge