IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

OMAR ALOMARI                          :
                                      :
        Plaintiff,                    :        Case No. 2:11-CV-613
                                      :
    v.                                :        JUDGE ALGENON L. MARBLEY
                                      :
OHIO DEPARTMENT OF                    :        Magistrate Judge Deavers
PUBLIC SAFETY, *et al.*,              :
                                      :
        Defendants.                   :

## OPINION AND ORDER

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment of Defendants Ohio Department of Public Safety, Director Thomas P. Charles in his Official Capacity, Thomas J. Strickrath, and William F. Vedra, Jr. (Doc. 60), and Plaintiff Omar Alomari's Motion for Summary Judgment. (Doc. 77). For the reasons stated below, Defendants' Motion is **GRANTED** and Plaintiff's Motion is **DENIED**.

## II. BACKGROUND

### A. Factual Background

In July 2005, Plaintiff Omar Alomari ("Plaintiff" or "Alomari") began working at Ohio Homeland Security ("OHS"), as part of the Ohio Department of Public Safety ("ODPS"). The purpose of his position was to create a liaison at OHS between the law enforcement and Muslim communities in central Ohio. From approximately November 2005 through October 2006, Alomari worked an average of 40 hours per week as a contract employee of OHS. Alomari

1

initially reported to Executive Director of Homeland Security, John Overly, before Overly was succeeded by Bill Vedra.

During his employment, Alomari conducted or participated in presentations or trainings for different law enforcement-affiliated groups, often discussing Arabic/Islamic culture and radicalization. Some of Alomari's presentations were met with conflicting, and some controversial, information from co-presenters. In fall 2008, Alomari spoke about radicalization at a Terrorism Liaison Officer ("TLO") training. Following Alomari's presentation, Columbus Police Officer Todd Sheets spoke about international terrorism. At the beginning of Sheets' presentation, he made what Alomari considered to be contradictory comments about Alomari's speech. Alomari complained to Vedra about the content of Sheets' presentation. Similarly, Alomari attended a January 2009 training held at the Columbus Police Academy, and put on by a group called Security Solutions International ("SSI"). Alomari felt that the speaker misstated a great deal of allegedly historical information about the Islamic community. In response to the SSI training, Alomari alleges that he wrote Vedra a six or seven page report, explaining why he thought the presentation undermined the outreach efforts of OHS.

On April 13, 14, and 15, 2010, the Columbus Police Department held a two-and-a-half day training entitled, "Understanding the Threat to America" at the Columbus Police Training Academy. The training was run by John Guandolo and Stephen Coughlin. Neither Vedra nor Alomari attended the training session. During the training, Vedra received phone calls from training attendees who thought that the presenters were making offensive statements about Alomari. Vedra was also told that Coughlin and Guandolo showed a picture of Vedra, Alomari, and a representative from the Council on American-Islamic Relations ("CAIR")[1] that had been

---

[1] Certain CAIR officials had been investigated by the FBI, leading the FBI to cut off association with CAIR. According to Defendants, "OHS had asked the FBI about CAIR, and OHS was told that the FBI had no problem

taken at an interfaith forum Alomari had organized. Presumably using the photo as "evidence," Coughlin and Guandolo accused Alomari and Vedra of associating with a terrorist organization.

Starting in March 2010, and continuing throughout the course of his employment, Alomari was met with criticism from The Jawa Report, an anonymously-authored extreme Right Wing blog. The blog attacked Alomari on numerous grounds, ranging from his testimony before a Congressional committee to a 40-page cultural guide Alomari had authored. Based on Alomari's work, the blog alleged that Alomari was promoting Islamist propaganda. April 2010 posts targeted both Alomari and Vedra, accusing both men for their association with CAIR. The blog went as far as to claim that Alomari was working at ODPS as a mole for CAIR, and Vedra knowingly permitted Alomari to work as a terrorist insider. The blog often claimed to have received information from unnamed insiders at ODPS.

On April 20, 2010, the Jawa Report began writing posts about Alomari's removal from his previous position at Columbus State Community College ("CSCC"), a position that had not been included on Alomari's employment records with ODPS. The April 20, 2010 post alleged that Alomari's removal from CSCC was due to Alomari's engagement in a sexual relationship with one of his female students. An April 21, 2010 post again referenced Alomari's termination from CSCC based on his involvement with a female student, but went onto discuss ODPS employee Olen Martin's educational background. According to an unnamed insider, Martin had given a fake bachelor's degree and fake master's degree on his ODPS employment application. The post claimed that Suffield University, the school from which Martin obtained his degrees, was a "known diploma mill." (*Defendants' Motion for Summ. Judg.*, Doc. 60 at 15). On April 27, 2010, the Jawa Report published another post about Alomari, this time concerning Alomari's

---

with CAIR's office in Columbus, Ohio. Accordingly, OHS maintained a dialogue with the local CAIR office." (*Defendants' Motion for Summ. Judg.*, Doc. 60 at 13).

lawsuit against the student with whom he had been involved at while employed at CSCC.  Vedra did not read any of the Jawa Report posts, and did not consider it to be a legitimate news source.

Shortly thereafter, a few media outlets contacted ODPS and inquired about whether Alomari had omitted his employment history with CSCC, and any related incidents, on his ODPS employment records.  Vedra was made aware of the media requests, and asked Alomari if there was any truth to them.  Alomari stated that he had not included his employment with CSCC on his application.[2]  Based on Alomari's admission that he had failed to include his employment with CSCC on his ODPS applications, ODPS initiated a disciplinary process, which led to an administrative investigation ("AI").  The investigation was conducted by Kathleen Botos, an investigator in ODPS' AI unit.

Botos was instructed to start her investigation by reviewing the Jawa Report posts concerning Alomari's employment at CSCC, and determine if there was any truth to it.  Following some online research, Botos found court records concerning Alomari's lawsuit against his former student, whom he had sued following his termination from CSCC.[3]  Botos also examined Alomari's civil service application in his personnel folder, which did not include any

---

[2] Alomari had been employed as a professor at CSCC from 1991 through 1996.  In spring 1996, Alomari became romantically involved with Sheri Lenk, a CSCC student.  They dated until September 1996, when Lenk ended the relationship, but then attempted to rekindle the relationship numerous times.  On December 2, 1996, Lenk filed a sexual harassment complaint against Alomari with Dr. Lee Willis, the CSCC Vice President for Student Services.  CSCC conducted an investigation based on Lenk's allegations, which eventually resulted in Alomari's removal from his position.

On December 31, 1996, shortly after Alomari's termination from CSCC, attorney Emily Lewis informed CSCC that Alomari was filing a grievance regarding his discharge from CSCC.  The grievance procedure included a case presentation to a panel of faculty and staff, who were to consider whether Lenk and Alomari had been sexually involved while Lenk was enrolled in Alomari's class.  Though the panel found that the evidence did not conclusively show that Alomari had a consensual sexual relationship with Lenk while she was his student, CSCC's Vice President for Academic Affairs affirmed the findings of the investigation committee, and upheld Alomari's termination.  It was not until the end of 1998, however, that Alomari reached a settlement with CSCC.

[3] On January 19, 1999, Alomari filed a lawsuit against Lenk in the Franklin County Court of Common Pleas, alleging: intentional infliction of emotional distress; defamation; tortious interference with a contract; and negligence.  Lenk filed a counterclaim against Alomari, alleging: intentional infliction of emotional distress; negligent infliction of emotional distress; fraudulently inducing her into an intimate relationship which broke up her marriage; and sexual battery.  On March 30, 2000, Lenk moved from summary judgment, which the Common Pleas Court granted on August 9, 2000.

information about his employment with CSCC.  Alomari claims that he filled out a handwritten application, for which he was told only to include relevant previous employment, and thus neglected to include CSCC.  Botos did not find a handwritten application in his personnel file. Alomari further alleges that, when he was initially hired, he hand-delivered a copy of his resume, despite being asked to email a copy; Botos, however, did not see a copy of Alomari's resume in his personnel folder.  Upon review of a copy of the background investigation done on Alomari, Botos did not see CSCC listed as a previous employer.

On May 13, 2010, Botos conducted an interview with Alomari as part of the AI.  In keeping with custom practice, the interview was recorded.  During the interview, Alomari conceded that he did not include CSCC, or various other previous employers, on his employment application.  According to Alomari, he felt he only needed to include any previous employment that was relevant to the job he was performing for ODPS.  Alomari told Botos that he had not taught Islamic studies, or anything similar.  Furthermore, he stated that he had resigned from CSCC, after submitting his resignation pursuant to a settlement in arbitration.  According to Alomari, CSCC did not terminate his employment.  After Botos stated that she had documentation from the Ohio Civil Rights Commission explaining that Alomari had filed a wrongful termination charge against CSCC, Alomari then said that CSCC had threatened to fire him.  Alomari also said that he had been investigated for having a relationship with a CSCC student, but that she had not been his student—a statement he doubled back on when questioned by Botos.  When asked about his lawsuit against Lenk, Alomari insisted that, while he could not remember her charges against him, he had dropped the lawsuit.

Following her interview with Alomari, Botos compiled documents she had received from various sources, including documents obtained by CSCC through a public records request.  In

her report, Botos found that: Alomari had purposely omitted numerous previous employers from his background investigation and employment application, including CSCC; the evidence showed that Alomari had not resigned from CSCC, but was terminated for engaging in a sexual relationship with one of his students; Alomari was dishonest during his AI interview with Botos; and Alomari knowingly ignored the ODPS application instruction that said to include all previous employers, thereby giving the impression of impropriety regarding his removal from CSCC.

Subsequently, ODPS Director Thomas Strickrath called a meeting to discuss Alomari and to determine whether he should be disciplined. Vedra, ODPS Assistant Director George Maier, ODPS Human Resources Director Rob Young, Larry McCartney, interim ODPS general counsel Heather Frient, and ODPS Deputy Chief of Staff Mike McCann attended the meeting. The group decided that Alomari should be removed, but Vedra, in particular, recommended that Alomari be removed based on the findings of the AI. Strickrath was responsible for making the final decision, and it was his opinion that, if the circumstances surrounding Alomari's termination from CSCC has been known at the time he applied, Alomari would likely not have been hired. Alomari was terminated on June 30, 2010.

Immediately following Alomari's termination from OHS, he appealed the decision to the State Personnel Board of Review ("SPBR"). During discovery on the merits of removal, ODPS claimed that Alomari's duties had made him an unclassified fiduciary, as a high-level policymaking employee for ODPS, under O.R.C. § 124.11(A)(9). On May 3, 2011 and June 27, 2011, hearings were held before an Administrative Law Judge ("ALJ") of the SPBR. On October 20, 2011, the ALJ issued a Report and Recommendation, finding that Alomari's duties at ODPS had resulted in his being an unclassified fiduciary to ODPS. Moreover, the ALJ found

that Alomari was a liaison between the U.S. Department of Homeland Security and OHS. Around January 6, 2012, the SPBR adopted the ALJ's Report and Recommendation and dismissed Alomari's civil service appeal.

*B. Procedural Background*

Plaintiff filed his Complaint on July 13, 2011, alleging six claims: (1) national origin discrimination, in violation of 42 U.S.C. § 2000e *et seq*.; (2) religious discrimination, in violation of 42 U.S.C. § 2000e *et seq*.; (3) race discrimination, in violation of 42 U.S.C. § 1981; (4) retaliation for opposing discrimination, in violation of 42 U.S.C. § 1981; (5) equal protection, in violation of 42 U.S.C. § 1983; and (6) First Amendment retaliation, in violation of 42 U.S.C. § 1983. (Doc. 2). On October 21, 2013, Defendants filed their Motion for Summary Judgment. (Doc. 60). Two days later, on October 23, 2013, Plaintiff filed his Motion for Summary Judgment. (Doc. 77).[4]

On July 17, 2014, this Court held oral argument on the parties' Motions for Summary Judgment, and counsel for all parties participated. This matter is, therefore, ripe for review.

## III. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

---

[4] During the discovery process, Plaintiff filed two Motions to Compel Discovery, seeking to obtain information on matters Defendants argued were privileged. (Doc. 33, Doc. 44). After both Motions were denied by the Magistrate Judge (Doc. 35, Doc. 41, Doc. 78), Plaintiff filed Objections (Doc. 38, Doc. 43) that were resolved by this Court in its June 19, 2014 Order. (Doc. 85).

A movant for summary judgment meets its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). At that point, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Id.* (quoting Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.,* 782 F.2d 609, 615 n. 5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 759 (6th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The standard of review for cross-motions for summary judgment "does not differ from the standard applied when a motion is filed by only one party to the litigation." *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

## IV. LAW & ANALYSIS

At oral argument, Plaintiff moved for an adverse inference regarding Alomari's resume, which was never produced during discovery. The Court must address Plaintiff's request before moving forward in its analysis.

To establish an adverse inference instruction based on the destruction of evidence, Alomari, as the moving party:

> "must establish: (1) that the party having control over the evidence
> had an obligation to preserve it at the time it was destroyed; (2)
> that the records were destroyed with a culpable state of mind; and
> (3) that the destroyed evidence was relevant to the party's claim or
> defense such that a reasonable trier of fact could find that it would
> support that claim or defense."

*Beaven v. United States DOJ,* 622 F.3d 540, 553 (6th Cir.2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002)). Plaintiff argues the Court should grant an adverse inference regarding Alomari's resume, the handwritten application he completed, and various other pieces of evidence that have not been produced during discovery. Regarding Plaintiff's resume, Defendants state that they have been unable to produce it, because it is not in Alomari's personnel file, where it should be located. Defendants made no argument as to the other pieces of evidence referenced by Plaintiff.

Considering the facts in the light most favorable to Plaintiff, he can arguably establish the first and third prong of the adverse inference test. Plaintiff has not shown, however, that ODPS destroyed the records with a culpable state of mind. Moreover, there is a disputed issue of material fact that ODPS ever possessed the resume in the first place. Thus, Plaintiff's request for an adverse inference is **DENIED**.

### A. National Origin and Religious Discrimination, and Equal Protection

The Court now turns to Plaintiff's claims of discrimination based on his national origin, religion, and race. Counts I and II, national origin discrimination and religious discrimination, respectively, are brought pursuant to Title VII. Count V alleges an equal protection violation, in violation of 42 U.S.C. § 1983. Within his equal protection claim, Plaintiff inherently raises a race discrimination claim.[5] Moreover, Plaintiff's claims for national origin and religious discrimination, as well as his equal protection violation, are each raised within the confines of

---

[5] Plaintiff cites his race throughout Count V of the Complaint. (*Complaint*, Doc. 2 at 14).

workplace conduct.  It is well settled that "[t]he elements for establishing an Equal Protection

claim under § 1983 and the elements for establishing a violation of Title VII disparate treatment

are the same."  *Deleon v. Kalamazoo County Road Com'n*, 739 F.3d 914, 917-18 (6th Cir. 2014)

(internal citations omitted); *see also Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir.

2012).  The Court will, therefore, address Plaintiff's discrimination and equal protection claims

within one analysis.

Title VII prohibits employment practices that "discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  To

establish discrimination under Title VII, a plaintiff may "introduc[e] direct evidence of

discrimination or…[prove] inferential and circumstantial evidence which would support an

inference of discrimination."  *DiCarlo v. Potter,* 358 F.3d 408, 414 (6th Cir.2004) (quoting *Kline*

*v. TVA,* 128 F.3d 337, 348 (6th Cir.1997)).

### 1.   Plaintiff's Title VII Claims

Defendants assert that Plaintiff's claims should be considered under the familiar

*McDonnell Douglas* burden-shifting framework.  *See White v. Baxter Healthcare Corp.*, 533

F.3d 381, 390 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

Plaintiff, however, presents arguments under *McDonnell Douglas*, and through a mixed-motive

analysis.  Under the *McDonnell Douglas* standard, the Court considers only circumstantial

evidence of Plaintiff's Title VII claims.[6]  *See Serrano v. Cintas Corp.*, 699 F.3d 884, 892-93 (6th

Cir. 2012).  Under the mixed-motive analysis, the Court may consider direct or circumstantial

---

[6] In such cases, direct evidence is considered before delving into the *McDonnell Douglas* tripartite standard applied
to circumstantial evidence.

evidence of Plaintiff's discrimination arguments.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (internal citation omitted).  Thus, the Court must determine the proper framework for Plaintiff's Title VII claims prior to proceeding in its analysis.

It is well established that a mixed motive analysis will only be triggered in Title VII discrimination cases when the plaintiff has brought proper notice of his mixed-motive claims. *Spees v. James Marine, Inc.*, 617 F.3d 380, 390-91 (6th Cir. 2010) (citing *Hashem-Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009)); *see also Ondricko*, 689 F.3d at 649. Notice "can be triggered expressly by invoking the mixed-motive analysis or impliedly through use of the motivating factor test in the complaint and responsive pleadings." *Ondricko*, 689 F.3d at 649 (citing *Spees*, 617 F.3d at 390).  Here, Plaintiff brought notice of his mixed-motive analysis in his motion for summary judgment.  (*See Plaintiff's Motion for Summ. Judg.*, Doc. 77 at 21, 29).  Furthermore, Plaintiff alleges that he gave notice of the mixed-motive analysis in paragraph 34 of the Complaint, which states, "Defendant Vedra identified 'the fact that he's of Arab descent' and OHS was 'too focused on Arab[s]' as motivating factors for Plaintiff's termination."  (*Complaint*, Doc. 2 at 8).  Plaintiff has thus met the notice requirement for instigating a mixed-motive analysis, and the Court need only consider his Title VII claims under that framework.

### 2.  Mixed-Motive Analysis

The mixed-motive framework applies in cases "where an adverse employment decision was a mixture of legitimate and illegitimate motives."  *Wexler v. White's Fine Furniture, Inc*, 317 F.3d 564, 571 (6th Cir. 2003) (internal citation omitted).  A plaintiff "can pursue a mixed-motive claim under Title VII based on direct evidence or solely on circumstantial evidence." *Ondricko*, 689 F.3d at 649 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003)).

Under this analysis, "a plaintiff[] need only produce evidence sufficient to convince a jury that: (1) the defendant[s] took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *Bartlett v. Gates*, 421 F. App'x 485, n.1 (6th Cir. 2010) (citing *White*, 533 F.3d at 400). Stated otherwise, "the ultimate question at summary judgment on a mixed-motive case is whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that a protected characteristic was a *motivating factor* in the defendant's [termination of] the plaintiff." *Williams v. Zurz*, 503 F. App'x 367, 377 (6th Cir. 2012) (internal citation omitted).

It is undisputed that Plaintiff was terminated from his employment, thereby suffering an adverse employment action. *See Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (citing *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002) (a termination can constitute a materially adverse employment action)). Thus, this analysis will focus on the latter prong of the mixed-motive framework.

### i. Direct Evidence

The Court first considers the direct evidence that Plaintiff proffers to demonstrate Defendants alleged discriminatory actions. Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Shazor v. Professional Transit Management, Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006)). Moreover, direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice

12

against members of the protected group."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Plaintiff points to Vedra's testimony at the SPBR hearing in May 2011 as evidence that Vedra made the recommendation that Strickrath terminate Alomari because Alomari is Arab. First, when asked, "What was the impetus for this change from multicultural community engagement to not multicultural community engagement?"  Vedra responded by saying, in part, "I wanted, a, a woman to send a signal to the community that – that you're in America."  Next, when asked, "So are you telling me now that his focus was on Muslim?"  Alomari answers, "No. The fact that he's of Arab descent and I think there was some, you know, feelings that, you know, we were maybe too focused on Arab."  In addition to Vedra's SPBR testimony, Plaintiff claims that Vedra's supposed remarks, as reported by an "unnamed insider" for the Jawa Report, shows that Vedra's statements during his SPBR testimony are not random or isolated.  Finally, Plaintiff argues that ODPS' differential treatment of Olen Martin can only be explained by discrimination and retaliation.

Defendants argue that Plaintiff's reliance on Vedra's SPBR testimony is erroneous. According to Defendants, the SPBR hearing was meant to be limited to Alomari's employment responsibilities for the two years prior to his termination, but the ALJ permitted questions about Renata Ramsini, Alomari's eventual replacement, for background purposes.  Thus, Defendants claim that Vedra's testimony does not demonstrate what factored into the decision to terminate Alomari, but rather the direction the Community Engagement Officer position would take following Alomari's termination.  Moreover, Defendants emphasize that the SPBR testimony took place months after Alomari's removal.  Defendants also stress that Alomari testified that no one at ODPS ever commented about his ethnicity or national origin, nor made any statements

13

about his religion or race.  Further, Alomari was unable to recall any statements made by Strickrath or Vedra that linked his termination to his allegedly protected speech.

Plaintiff has not demonstrated direct evidence of Title VII discrimination.  Both the SPBR testimony and the information included on The Jawa Report would require a reasonable juror to draw inferences to find that Defendants' allegedly discriminatory actions were motivated, at least in part, by unlawful discrimination.  *See Grizzell*, 461 F.3d at 719 (internal citation omitted).  Summary judgment, therefore, cannot be granted based on direct evidence.

### ii. Circumstantial Evidence

Though Plaintiff has failed to proffer direct evidence of discrimination, the Court's analysis continues through an examination of the circumstantial evidence.  Because Plaintiff's termination is an undisputed material fact, in order to survive summary judgment, he need only "produce evidence sufficient to convince a jury that…'race, color, religion…or national origin was *a* motivating factor' for [the termination]."  *Williams*, 503 F. App'x at 375 (quoting *White*, 533 F.3d at 400) (internal quotation omitted).

Plaintiff relies entirely on Defendants' allegedly preferential treatment of Olen Martin, an employee whom Alomari considers to have been similarly situated.  Plaintiff takes particular issue with Defendants' decision to conduct an investigation of Alomari based on his failure to divulge his employment at CSCC, while choosing not to investigate Martin for receiving degrees from an alleged diploma mill.  According to Plaintiff, Defendants' failure to investigate Martin is based on the fact that Martin is a white, non-Muslim, while Alomari is an Arab Muslim. Plaintiff further asserts that Defendants insistence that Martin's degrees were not relevant to his position does not justify Defendants choice not to conduct an investigation of Martin based on allegations made by the Jawa Report.

Defendants claim that Plaintiff does not have circumstantial evidence of discrimination. Defendants draw a few distinctions between Alomari and Martin.  First, Defendants argue that Alomari and Martin cannot be considered similarly situated, because their individual jobs were vastly different and had particular requirements.  Martin did not report to Vedra, nor did he perform the duties of testifying in front of a congressional committee.  Martin was also not placed on an advisory committee for DHS.  Moreover, Defendants claim that Martin's degree, regardless of its merit, was not a necessary component of Martin's employment.  Conversely, Alomari omitted his history with CSCC, and when probed about it, answered subsequent questions with false information.

The threshold for summary judgment under the mixed-motive analysis is, undoubtedly, lower than that applied under the *McDonnell Douglas* standard.  Plaintiff, however, relies heavily on speculation rather than undisputed facts.  Plaintiff has not provided this Court with evidence to indicate that there are disputed issues of material fact that meet the mixed-motive burden of demonstrating that Defendants' termination decision was improperly motivated by Plaintiff's race, religion, or national origin.  Moreover, a reasonable juror could not objectively conclude that Defendants decision to terminate Alomari was improperly motivated by Plaintiff's race, religion, or national origin.  Defendants' Motion for Summary Judgment on Counts I, II, and V, is, therefore, **GRANTED**.

### B. Hostile Work Environment

Plaintiff next raises a hostile work environment claim.  As the Sixth Circuit has set forth:

> Under Title VII, a plaintiff establishes a prima facie case of a
> hostile work environment based on race, religion, or national
> origin by demonstrating that (1) she was a member of a protected
> class; (2) she was subjected to unwelcome harassment; (3) the

> harassment was based on race, religion, or national origin; (4) the
> harassment unreasonably interfered with her work performance by
> creating an intimidating, hostile, or offensive work environment;
> and (5) the employer is liable.

*Ejikeme v. Violet*, 307 F. App'x 944, 949 (6th Cir. 2009) (citing *Hafford v. Seidner,* 183 F.3d

506, 512 (6th Cir.1999); *Bourini v. Bridgestone/Firestone N. Am. Tire, L.L.C.,* 136 Fed.Appx.

747, 750 (6th Cir.2005) (prima facie elements are the same for claims of racial and religious

discrimination)).  Plaintiff, however, improperly raised his hostile work environment claim for

the first time in his motion for summary judgment.  A plaintiff may not defeat summary

judgment by asserting a claim that he did not plead in the complaint. *Tucker v. Union of*

*Needletrades, Indus., and Textile Employees,* 407 F.3d 784, 787-88 (6th Cir.2005) (instructing

that if discovery reveals a claim not previously raised, the plaintiff should seek to amend the

complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure); *see also Serra v. Mary*

*Jane Elliott, P.C.*, 13-11814, 2014 WL 1608665, at *3 (E.D. Mich. Apr. 22, 2014) ("The proper

procedure for Plaintiff to raise this claim was to request leave to amend her complaint, not to

raise the claim for the first time in a motion for summary judgment or a summary judgment

response brief."); *Carter v. Ford Motor Co.*, 561 F.3d 562 (6th Cir. 2009) (plaintiff's claim was

limited to theories relied upon during discovery).  If Plaintiff wanted to raise a claim of hostile

work environment, he could have done so properly by seeking to amend his complaint pursuant

to Fed. R. Civ. P. 15.  Because Plaintiff neglected to amend his Complaint and bring properly his

claim for hostile work environment, the Court will not consider it on summary judgment.


### C. Race Discrimination and Retaliation Under 42 U.S.C. § 1981

Plaintiff brings two claims under 42 U.S.C. § 1981: race discrimination and retaliation for

opposing discrimination.  Defendants argue that, pursuant to the Sixth Circuit's interpretation

and application of *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), Plaintiff's §

1981 claims are barred.  Plaintiff counters that, because his position could be reinstated, his §

1981 claims are valid.  In *McCormick v. Miami University*, the Sixth Circuit reaffirmed the

court's prior holdings that § 1983 is the sole remedy for § 1981 violations committed by state

actors:

> Whether the violation of § 1981 is committed by a municipality
> through its policies or custom, or individuals acting under the color
> of state law, § 1983 contains an express clause permitting an
> aggrieved person to sue the state actor for money damages. Section
> 1983's express clause permitting these suits obviates the need to
> imply the same right under the general provisions of § 1981.
> Accordingly, we conclude that § 1983 is the exclusive mechanism
> to vindicate violations of § 1981 by an individual state actor acting
> in his individual capacity.

693 F.3d 654, 661(6th Cir. 2012); *see also Mensah v. Michigan Dep't of Corr.*, 513 F. App'x

537, 538 (6th Cir. 2013); *Woo Young Chung v. Berkman*, 13-CV-1354, 2013 WL 4523513 (N.D.

Ohio Aug. 26, 2013), appeal dismissed (Mar. 31, 2014); *Machie v. Detroit Library Com'n*, No.

12-15299, 2014 WL 2648521, at *6 (E.D. Mich. June 13, 2014).  Because Plaintiff's § 1981

claims were committed by individuals acting under color of state law, and Plaintiff did not

prosecute those claims under § 1983, Plaintiff's claims were improperly brought.  As such,

Plaintiff's § 1981 claims are barred, and Defendant's Motion for Summary Judgment is

**GRANTED** on Counts III and IV.

### D. First Amendment Retaliation Claim

To establish a claim of retaliation under the First Amendment, Plaintiff's complaint must

set forth three elements: (1) Plaintiff was engaged in a constitutionally protected activity;

(2) Defendants' adverse action caused Plaintiff to suffer an injury that would "likely chill a

person of ordinary firmness from continuing to engage in that activity"; and (3) the adverse

action was motivated at least in part as a response to the exercise of Plaintiff's constitutional

rights. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001).  As this Court

has previously established, Plaintiff's termination constitutes an adverse action.  Thus, the Court

need only address the first and third prongs of the First Amendment retaliation claim below.

### 1. Constitutionally Protected Speech or Conduct

When considering whether Plaintiff's speech, as a government employee, warrants First

Amendment protection, the Court must first determine whether the employee spoke as a citizen,

and the employee must have addressed a matter of public concern.  *Weisbarth v. Geauga Park*

*Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).  In *Housey v. Macomb County*, the Sixth Circuit

clarified the framework used to determine whether a government employee's speech is protected:

> a public employee's speech is only protected when: (1) it touches
> on "a matter of public concern," *Connick v. Myers,* 461 U.S. 138,
> 146 (1983); (2) it is not uttered pursuant to the employee's "official
> duties" but rather "as a citizen," *Garcetti v. Ceballos,* 547 U.S.
> 410, 421, 424, (2006); and (3) the employee's interest in the speech
> outweighs the government's interest in promoting "the effective
> and efficient fulfillment of its responsibilities to the public," *id.* at
> 450. All three are necessary but not sufficient conditions. *Evans–*
> *Marshall v. Bd. of Educ. Of the Tipp City Exempted Vill. Sch.*
> *Dist.,* 624 F.3d 332, 338 (6th Cir. 2010).

534 F. App'x 316 (6th Cir. 2013).

It is well settled that "a matter of public concern usually involves a matter of political,

social, or other concern to the community."  *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir.

2007) (internal citation omitted).  The rationale behind protecting a government employee's right

to comment as a citizen on matters of public concern is that "public employees are often the

members of the community who are likely to have informed opinions as to the operation of their

public employers, operations which are of substantial concern to the public."  *City of San Diego*

*v. Roe*, 543 U.S. 77, 82 (2004).  A government employee must also demonstrate that his or her interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205 Will Cmty., Ill.*, 391 U.S. 563, 568 (1968).  This determination is a question of law for the court to decide.  *Connick*, 461 U.S. at 147.  As the Supreme Court explained in *Garcetti v. Ceballos*:

> The Court's decisions, then, have sought both to promote the individual and societal interest that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. . . . Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.

547 U.S. 410, 420 (2006) (citations omitted).

Defendants claim that all of Alomari's allegedly protected speech was made in relation to his job duties as a Multicultural Affairs/Community Engagement Officer, thereby making the comments part of his employment.  Relying on the *Weisbarth* court, Defendants insist that Alomari's speech should not be considered constitutionally protected.  *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544-45 (6th Cir. 2007) (in determining whether employee's speech is constitutionally protected, the court must consider "whether the employee communicated pursuant to his or her official duties.").  Alomari was expected to engage in an analysis of the various trainings, including those about which he complained.  Thus, Defendants proffer that his statements were part of his official duties.  Additionally, Alomari has failed to present any examples of speech that was not related to his official duties.  Finally, because Alomari's speech primarily concerned his complaints about the direction of future OHS and DHS training sessions,

and employee grievances are not inherently constitutionally protected[7], Alomari's speech does not meet the first prong of the First Amendment retaliation analysis.

Plaintiff asserts that his speech was as a concerned citizen, not in relation to his job, and therefore must be considered constitutionally protected.  Alomari complained about the trainings that he considered too racially and religiously biased for two reasons.  First, he claims that he was worried that the trainings would spread incorrect information that could possibly lead to harm to citizens.  Second, Alomari states that he believed the trainings were counter to the purpose and focus of the Community Engagement Office, OHS, and DHS.  Alomari alleges to have complained to certain people outside his chain of command, intimating that doing so lends itself to speaking as a concerned citizen rather than in connection with his employment.  Plaintiff further argues that his speech concerned only issues that were a matter of public concern, because they dealt with the public's trust, safety, and management of public monies.

Plaintiff has failed to demonstrate that his speech should be constitutionally protected.  First, Alomari has not presented adequate evidence that would lead a reasonable juror to find that he was speaking as a citizen, and not as part of his official duties, when he voiced his complaints about the training sessions.  Second, Plaintiff has failed to demonstrate that his complaints regarded matters of public concern.  Plaintiff has not pointed to any issues of material fact regarding the training sessions with which he takes issue.  The Court considers his speech to be directly related to his job duties, and, therefore, not constitutionally protected under First Amendment Retaliation.  As such, summary judgment on Count VI is **GRANTED**.

2. <u>Causal Connection</u>

---

[7] *See Defendants' Motion,* Doc. 60 at 43, citing *Garcetti*, 547 U.S. at 420.

Even if Plaintiff had demonstrated that his conduct was constitutionally protected, a reasonable jury would not be able to find that he had shown a causal connection between his termination and his allegedly protected conduct.

Under the next prong of First Amendment retaliation, the Court must consider whether the adverse action was motivated at least in part as a response to the exercise of Plaintiff's constitutional rights. In the case *sub judice*, Plaintiff must demonstrate that his protected speech and his termination were causally connected. *See Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 399 (6th Cir. 2010) (citing *Thaddeus-X*, 175 F.3d at 399). The Sixth Circuit has set forth the two-step test in determining causation in retaliation actions:

> A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, *Siggers–El v. Barlow,* 412 F.3d 693, 702 (6th Cir. 2005), but also (2) that the individual taking those acts was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right," *Thaddeus–X,* 175 F.3d at 386.

*King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) *cert. denied*, 133 S. Ct. 985 (U.S. 2013).

Defendants allege that Alomari is unable to show that there was a causal connection between his termination and his protected conduct. Defendants claim that there is no evidence to indicate that Strickrath, the ultimate decision maker in Alomari's termination, had any knowledge of Alomari's protected speech. Rather, Strickrath received the AI report and made the decision to end Alomari's employment based off of that. Moreover, Alomari is unable to demonstrate that he ever discussed the issue with Strickrath. Because Alomari cannot link his removal to his speech, Defendants maintain that Alomari cannot meet the burden of showing that there is a causal connection between his allegedly protected activity and his termination.

Plaintiff contends that the temporal proximity between Plaintiff's protected conduct and his subsequent termination is sufficient to show the causal connection between the two. According to Plaintiff, there was a twelve-day period between his last complaints and Vedra's

decision to begin an investigation concerning Alomari.  Additionally, less than three months

elapsed between Alomari's final complaint and his termination.  Alomari insists that, even if the

temporal proximity between his conduct and termination are insufficient to show causation, he

has other evidence.  Namely, ODPS' preferential treatment of Olen Martin, a similarly situated,

white, non-Muslim employee.

Plaintiff fails to present any concrete evidence to support his causation argument.  Rather,

he resorts to speculation, suggesting that the temporal proximity alone should guide this Court to

find on his behalf.  Alomari's evidence does not show that his termination was proximately

caused by an individual Defendant's acts, nor that that individual was motivated by his or her

desire to retaliate against Alomari for exercising a constitutional right.  Stated otherwise, a

reasonable juror, taking the facts in the light most favorable to Plaintiff, would not find that

Plaintiff has met his burden for First Amendment retaliation.

The Court need not continue its analysis by examining whether Defendants' can show

"by a preponderance of the evidence, that the employment decision would have been the same

absent the protected conduct."  *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 294 (6th Cir.

2012) (internal citation omitted).  Defendant's Motion for Summary judgment on Count VI is

**GRANTED**.


*E. Qualified Immunity*

Defendants' final argument is that Defendants Vedra and Strickrath are entitled to

qualified immunity for the claims brought against them in their individual capacities.

The Supreme Court has held that "government officials performing discretionary

functions, generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotations and citations omitted).  An official is immune from both damages and suit if qualified immunity is applicable. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The plaintiff carries the burden of proof to show that the defendant is not entitled to qualified immunity.  *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

This Circuit employs a two-step process when deciding questions of qualified immunity, which is a question of law.  *Bell*, 308 F.3d at 601.  First, a court must determine whether, on the plaintiff's facts, a constitutional violation has occurred.  *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002).  Second, the court considers whether "the platintiff's constitutional right was clearly established."  *Kiessel v. Oltersdorf*, 459 F. App'x 510, 515 (6th Cir. 2012).

Defendants argue that Defendants Strickrath and Vedra should be granted qualified immunity for the claims brought against them in their individual capacities.  According to Defendants, Alomari has failed to show that he suffered a constitutional violation.  Moreover, even if there was a constitutional violation, Defendants argue that there is no way they could have been on notice of such violation, thereby warranting the shield of qualified immunity.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (discussing the notice requirement inherent in qualified immunity inquiries).

Plaintiff asserts that Defendants should not be granted qualified immunity for two reasons, both of which are directly linked to his claim of First Amendment retaliation.  First, Plaintiff insists that he has established a First Amendment violation.  Second, Alomari claims that Vedra and Strickrath had to have understood that terminating Alomari's employment for

"engaging in protected speech," was a constitutional violation of Alomari's rights.  (*Plaintiff's Resp.*, Doc. 80 at 44).

Plaintiff failed to establish that he suffered First Amendment retaliation.  Without a constitutional violation, the Court cannot apply qualified immunity.  Thus, this claim is **MOOT**.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED**, and Plaintiff's Motion is **DENIED**.  This case is DISMISSED.

**IT IS SO ORDERED.**

                                                 __ **s/Algenon L. Marbley**
                                                 **ALGENON L. MARBLEY**
                                                 **UNITED STATES DISTRICT JUDGE**

**Dated: August 13, 2014**